UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RONNIE JOE HOLLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CV68 TIA |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of

Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 5, 2008, Plaintiff filed an application for Disability Insurance Benefits ("DIB"),

alleging disability beginning September 17, 2007 due to neck surgery, knee problems, and problems

with memory and concentration. (Tr. 41, 98-101) Plaintiff's application was denied on October 8,

2008, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 39-

45, 50) On December 16, 2009, Plaintiff appeared and testified at a video hearing in West Plains,

Missouri before an ALJ located in San Francisco, California. (Tr. 18-38) In a decision dated January

8, 2010, the ALJ determined that Plaintiff had not been under a disability at any time from September

17, 2007 through March 31, 2008, the date last insured. (Tr. 8-14) The Appeals Council denied

Plaintiff's Request for Review on October 25, 2010. (Tr. 1-3) Thus, the decision of the ALJ stands

as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the video hearing before the ALJ, Plaintiff was represented by counsel.  At the beginning of the hearing, Plaintiff's attorney summarized a recent residual functional capacity assessment performed by Debbie Tolliver, a physical therapist.  According to the attorney, Ms. Tolliver spent 4 hours testing Plaintiff's limitations, after which she determined that Plaintiff could safely lift at the light work level, up to 20 pounds, and could possibly carry 30 pounds.  However, he was unable to lift or carry those weights on a regular basis.  In addition, Ms. Tolliver opined that Plaintiff could do no crouching, squatting, trunk flexion standing at all, nor could he stand for more than 20 minutes at a time.  She further stated that Plaintiff would perform any job, which put him at a high risk for further injury because he was unable to accept that he could no longer do what he could in the past. (Tr. 20-23)

Next, the ALJ questioned Plaintiff regarding his impairments that prevented him from working.  Plaintiff testified that his shoulders hurt when he tried to lift.  He was not receiving physical therapy, and Ms. Tolliver was a one-time examination.  Plaintiff was treated with pain pills, which somewhat took the pain away but made him tired and sleepy all day.  On a normal day, Plaintiff did basic housework such as vacuuming, loading the dishwasher, or feeding the animals on his farm. Plaintiff testified that he previously worked as a farrier, which entailed shoeing horses.  Plaintiff went to school for the occupation and was self-employed.  He was not sure how much weight he lifted on the job, as it depended on the weight of the horse.  He last worked in 2006 after his neck surgery. According to Plaintiff, the doctors told him not to work as a farrier any longer.  (Tr. 23-25)

On questioning by Plaintiff's attorney, Plaintiff stated that his physical problems stemmed from his neck and down into his shoulders.  He experienced pain every day, which started as a low-grade

pain and increased with lifting or any activity throughout the day. Plaintiff testified that the pain was located down his neck and into his shoulder. He did not know whether the pain was sharp or not. He took pain pills for relief. Heat and ice did not help, nor did the neck surgery. Plaintiff stated that nothing more could be done surgically. In addition, Plaintiff stated that his left hand would go numb and that the pain from his neck radiated only on the left side. The numbness would go down his arm and reach his hands if he did any lifting, pulling, or tugging. Plaintiff explained that his hand would go dead, causing him to drop things, if he did laundry, dishes, or other activities for 30 minutes or an hour. (Tr. 25-28)

Plaintiff also testified that he had trouble remembering things. He did not know whether his memory loss stemmed from his medication. Plaintiff stated that he would get up to do something, then forget what he was supposed to do. He also had problems with his left knee. Plaintiff described some sort of horse-related accident that blew out his knee and required surgery. He testified that his knee was "bone-on-bone." His leg hurt when he stood and sometimes caused him to fall down, although he tried to catch himself before falling to the floor. Plaintiff stated his knee would buckle if he stood for 20 to 30 minutes, but he did not know how far he could walk before the knee folded up. He had not been performing much activity but did note that uneven terrain such as stairs and hills were worse for his knee. (Tr. 28-30)

Plaintiff rated the pain in his neck and shoulders on a normal day as a 4 or 5 on a scale of 1 to 10. The pain pills took the pain "almost plumb away" but made him tired, wanting to sit around and sleep all the time. Plaintiff also testified to having good days and bad days. If he did nothing during the day, then he felt alright the next day. However, if he tried to get things done, he was sore. (Tr. 30-31)

Plaintiff had a high school diploma but stated that he could not read well. He could read but not understand the newspaper. Someone helped him read and complete the Social Security paperwork. Plaintiff could do very little math. He trusted cashiers to give him proper change in a store, and his wife checked the receipts when he returned home. (Tr. 31)

Next, George Horne, a vocational expert ("VE"), testified regarding Plaintiff's ability to work. Mr. Horne testified that he had been a VE for the past 10 years. With regard to information provided to Mr. Horne, he stated that he did not have records showing Plaintiff's earnings as a farrier. Plaintiff was unable to provide the income information, which varied. The VE opined that perhaps Plaintiff's farrier job did not constitute substantial gainful activity. (Tr. 32-33)

The ALJ then asked the VE to assume a person of Plaintiff's age, education, and past work who was limited as provided in Ms. Tolliver's report. The report suggested that Plaintiff could do only light work, with no crouching or stooping, and no standing for more than 20 minutes. The VE stated that the hypothetical person would be unable to perform Plaintiff's past work in the saw mill industry. However, the VE also testified that such individual, with no transferrable skills or sitting limitations, could perform sedentary, unskilled work. While the person could alternate sitting and standing at the light exertional level, anything more frequent than 30 minute intervals would interfere with pace, persistence, and productivity. The 20 minute stand limitation given in Ms. Tolliver's report would not interfere with sedentary, unskilled work. Jobs meeting this criteria which the hypothetical individual could perform included final assembler, table worker, and general assembler. These jobs existed in large number in Missouri and the U.S. economy. (Tr. 33-35)

Plaintiff's attorney also questioned the VE, asking whether a worker performing sedentary, unskilled work would require bilateral manual dexterity. The VE answered, "yes." The attorney

noted Plaintiff's testimony of numbness and tingling in the left hand, as well as dropping items, and she also mentioned Ms. Tolliver's conclusion that Plaintiff did not meet the worker's qualification profile. In light of this information, the VE testified that a person with these limitations would be unable to perform sedentary, unskilled work. In addition, if medication prevented the individual from being able to focus on work activity, causing he person to be off-task one-third of the time, the person would be unable to work. (Tr. 35-37)

In a Disability Report – Adult, Plaintiff reported that he was 5 feet, 7 inches and weighed 218 pounds. His neck surgery limited his ability to work in that he could not lift more than 50 pounds or lift his arms above his head. He had constant headaches and could not sit for more than 30 minutes without moving. He also experienced difficulty swallowing and choking sensations. Plaintiff stopped working on September 17, 2007 due to pain and stiffness in his neck. Plaintiff's longest job was as a laborer in a saw mill. (Tr. 112-19)

Plaintiff's wife also completed a Function Report – Adult on behalf of Plaintiff on September 9, 2008. The form states that Plaintiff got dressed in the morning, fed the chickens and dogs, then watched TV or went to town. After returning home, Plaintiff waited for his daughter to return from school, fed the chicken and dogs again, and gathered eggs. He sometimes started dinner, vacuemed the living room, or did the dishes. After supper, Plaintiff watched TV, showered, and went to bed. Plaintiff took care of his daughter and the animals. His wife also helped with their daughter. Before Plaintiff's condition, he could lift 50 pounds, feed animals without problems, stoop, raise his head, and stand for long periods of time. Plaintiff experienced problems with sleeping due to pain, but he had no problems with personal care. He did required reminders to take medication. Plaintiff was able to prepare complete meals daily, which took about an hour. In addition, Plaintiff cleaned the house,

did laundry, and mowed the yard. He shopped for household items and groceries once or twice a week. Plaintiff was unable to pay bills, handle a savings account, use a checkbook, or count change. His hobbies included watching TV, fishing, and hunting, although he was unable to walk very far or stand very long without pain. Plaintiff visited with friends and family in person and on the phone daily. Traveling was limited because Plaintiff could not sit for very long. (Tr. 123-28)

With regard to Plaintiff's functional abilities, he reported that his condition affected his ability to lift, squat, bend, stand, reach, walk, sit, remember, complete tasks, concentrate, understand, and follow instructions. Plaintiff specified that he could lift 20 pounds, but more weight caused pain. He could walk for 1/4 mile before needing to rest for 45 minutes. In addition, Plaintiff could pay attention for an hour. He did not follow written instructions well, and he followed spoken instructions only if explained in detail. Plaintiff was able to get along with most anyone and had never been fired from a job. He handled stress and changes in routine well. (Tr. 128-30)

Plaintiff's wife, Karen Holloway, also provided a letter on Plaintiff's behalf, explaining the changes in his ability to perform most activities since his neck surgery. (Tr. 163-64) Plaintiff's friend, Calvin Schleuning, from the feed store also sent a letter stating that Plaintiff could no longer cover for Mr. Schleuning during vacations because Plaintiff could no longer lift and carry 50 pound bags of feed. (Tr. 162)

### III. Medical Evidence

On May 26, 2005, Plaintiff underwent diagnostic and operative arthroscopy of the left knee to repair a meniscal tear. Gregory Hubbard, D.O., noted on June 15, 2005 that Plaintiff's knee was doing a little better. He had returned to work and had good range of motion. Plaintiff was to go back to the clinic if the pain or swelling worsened, at which point he could need an aspiration.

However, Plaintiff did not require physical therapy. (Tr. 237-50, 263)

On March 22, 2006, Plaintiff complained of low back pain after "fooling with some horses . . . and one of them jerked him very hard." Plaintiff was ambulatory without distress but was a little uncomfortable getting in and out of a chair. He demonstrated tenderness in the low lumbar area and upper gluteals. Flexion extension and rotation of the back appeared normal but showed some discomfort. Dr. Dale E. Haverstick assessed low back strain, muscular in nature. Dr. Haverstick prescribed Flexeril and Naprosyn and advised that Plaintiff try stretching and range of motion exercises. (Tr. 270)

On August 7, 2007, Plaintiff saw Jon W. Roberts, D.O., and Beverly Denton, FNP-C for complaints of a headache and neck pain beginning 2 months before. Plaintiff stated that the pain began in his shoulders, radiated, then concentrated in the right cervical spine area. Plaintiff was not in acute pain, but Dr. Roberts noted tenderness along the right cervical spine area. He assessed neck pain and prescribed Naproxen and Flexeril. In addition, Plaintiff was referred for a cervical spine x-ray. (Tr. 173) Treatment notes from August 16, 2007 showed an abnormal x-ray. In addition, Dr. Roberts assessed neck pain and numbness in Plaintiff's right arm and shoulder. He scheduled Plaintiff for an MRI of his cervical spine. (Tr. 172)

Dr. Sunghoon Lee, a spine surgeon, examined Plaintiff on September 17, 2007. Plaintiff reported that he began having neck and interscapular pain about three months prior. He had not experienced any weakness or loss of dexterity. He rated the pain as 6 or 7 out of 10 and described it as constant. Plaintiff had good strength with a normal sensory examination. Range of motion in the neck was limited in extension and lateral rotation. The MRI revealed a large herniated disk from the C5-6 level with a fragment extending down behind the vertebral body of C6. Dr. Lee noted

significant foraminal stenosis and spinal stenosis at that level. He planned to do epidural injections and physical therapy. (Tr. 169)

On September 24, 2007, Dr. Curtis C. Evenson performed a cervical interlaminar epidural via catheter. Dr. Evenson noted that Dr. Lee referred Plaintiff for a trial of epidural injections after Plaitniff complained of continuous, bilateral pain in his neck traveling through his shoulder. In addition, Dr. Evenson noticed a rather obvious disk protrusion at C5-6. Dr. Evenson diagnosed cervical disk protrusion without myelopathy. (Tr. 210) Plaintiff returned to Dr. Evenson on October 8, 2007 for a second epidural injection. Plaintiff reported that he did not notice much improvement after the last injection. The procedure went well, and Dr. Evenson diagnosed cervical disk protrusion without myelopathy and noted that Plaintiff would return to Dr. Lee. (Tr. 208)

Plaintiff saw Dr. Lee on October 29, 2007. In a letter to Dr. Jon W. Roberts, Dr. Lee stated that Plaintiff continued to have bilateral shoulder pain, worse on the left than right. Plaintiff had an acute disk rupture at C5-6 that is caudally down into the vertebral body of C6. Dr. Lee noted that Plaintiff had agreed to surgery. (Tr. 201) On November 21, 2007, Plaintiff underwent an anterior cervical corpectomy C6; interbody arthrodesis C5-6, C6-7; interbody cage implant; and anterior cervical plating, C5 to C7. Plaintiff was discharged the following day with a diagnosis of cervical radiculopathy and cervical myelopathy. (Tr. 191-99)

On December 13, 2007, Plaintiff returned to Dr. Lee for a follow-up visit. Plaintiff reported doing well with controlled pain and improved radicular symptoms. Plaintiff was neurologically intact and stable. In addition, x-rays looked good. Dr. Lee planned to continue using a neck collar and restricting Plaintiff to lifting only 10 pounds. Dr. Lee advised Plaintiff to discontinue using tobacco. (Tr. 189) A Post-Op Note dated January 24, 2008 revealed that Plaintiff was doing well. He denied

any pain or discomfort, drainage out of incision, or fever. Plaintiff was anxious to return to work and admitted doing light chores around the house and splitting wood. Plaintiff and his wife asked about physical therapy and help with stretching and strengthening. Plaintiff appeared well developed, well nourished, and in not acute distress. He ambulated without difficulty and had good strength and reflexes. Dr. Lee's office ordered physical therapy and recommended a good walking exercise program. Paul Strecker NRNP/ES also encouraged Plaintiff to be cautious with bending, lifting, and twisting. Plaintiff was to return in 4 weeks. (Tr. 186)

Dr. Lee examined Plaintiff on March 10, 2008 and noted that Plaintiff was doing very well, with no significant pain. Dr. Lee stated that he was releasing Plaintiff to follow up as needed. Three images of the cervical spine showed postoperative changes with anterior plate and screw fixation with interbody bone graft in the cervical spine at C5, 6, and 7. In addition, the prevertebral soft tissues were unremarkable with no identified complications. (Tr. 182-83)

Plaintiff returned to Dr. Lee on August 7, 2008, complaining of increased trouble swallowing, as well as burning and pain across his neck and shoulders. Upon physical examination, Plaintiff was neurologically intact and stable. X-rays showed well-placed hardware and good bony fusion. Dr. Lee planned to order EMG evaluation and an MRI. Plaintiff reported that no employer would hire him secondary to his cervical surgery. Plaintiff received a work release statement indicating he could return to work with no restrictions. (Tr. 179-80)

On August 21, 2008, Plaintiff underwent an MRI of the cervical spine. The exam revealed status-post interval C5 through C7 interbody fusion and ventral hardware stabilization. The central canal was well decompressed postoperatively, with mild bilateral neural foraminal narrowing at C5-6 and C6-7 similar to the preoperative study. Fusion was intact and the MRI showed no abnormal

marrow signal or enhancement.  (Tr. 176) On that same date, Dr. Lee noted that the MRI was negative.  He did not see any recurrent disc herniation or adjacent segment spondylosis.  Plaintiff understood that some of the aches and pains he experienced were a normal part of the surgery recovery process.  (Tr. 177)

A Physical Residual Functional Capacity Assessment completed October 8, 2008 revealed that Plaintiff could lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour work day; sit about 6 hours in an 8-hour work day; and push and/or pull without limitation.  He could frequently climb, stoop, kneel, crouch, and crawl; however he could never balance.  In addition, Plaintiff had no manipulative, visual, communicative, or environmental limitations.  Kevin Worthington, the medical consultant, reviewed Plaintiff's medical records and noted that Plaintiff's allegations were not fully credible.  (Tr. 212-16)

On February 27, 2009, Mike Gaddy, P.A., evaluated Plaintiff for complaints of a sinus problem and nasal congestion.  Plaintiff also requested a second opinion on his neck and a referral to orthopedics for his left knee.  Examination of the neck revealed normal range of motion.  His left knee demonstrated decreased range of motion, swelling, and effusion, with tenderness.  In addition, he had decreased range of motion, tenderness, pain, and spasm in his cervical back.  Diagnoses included stress, hypertension, neck pain, and knee pain.  Plaintiff was referred to orthopedic surgery. (Tr. 272-75)

Plaintiff underwent an MRI of his left knee on March 11, 2009.  The results included post surgical scarring from prior meniscus repair, along with a suggestion of definite recurrence or residual lateral meniscal tear.  The MRI also revealed myxoid degeneration of the posterior horn of the medial meniscus and early degenerative change in the medial and lateral compartments.  (Tr. 234)

On April 8, 2009, Plaintiff returned to Dr. Hubbard for complaints of persistent effusion in his knee. Plaintiff reported using a knee sleeve, but he did not require pain medication. Dr. Hubbard assessed a possible recurrent tear of lateral meniscus, left knee, and medial meniscal tear, left knee. Dr. Hubbard recommended an arthroscopic debridement of the knee and evaluation of the lateral and medial meniscal tears. (Tr. 252)

On May 7, 2009, Plaintiff underwent a diagnostic and operative arthroscopy with partial lateral meniscectomy as well as chondroplasty of patellofemoral joint and lateral joint line. The operation revealed a tear of the lateral meniscus and a tear just adjacent to the popliteal hiatus, which appeared unstable. Plaintiff was discharged with Vicodin and orders to engage in weight-bearing as tolerated. (Tr. 255-56)

Plaintiff returned to Dr. Hubbard on May 15, 2009. His range of motion was zero to 120, with 2+ effusion present. Plaintiff had removed his dressing a couple days after surgery and had been walking and performing normal activities. Plaintiff planned to use ice therapy for the swelling. Dr. Hubbard recommended that Plaintiff return to normal activities as tolerated and follow up as needed. (Tr. 254)

On July 10, 2009, Plaintiff visited SJC Eminence for complaints of neck pain radiating into his trapezius area. Plaintiff stated that after his surgery, he became very stiff and sore, with trouble performing daily activities. Mike Gaddy, P.A., examined Plaintiff and found him to be in no acute distress. Plaintiff had limited range of motion in his neck, which related to left hand and left leg numbness and weakness. Mr. Gaddy referred Plaintiff to neurosurgery for cervical pain, but Plaintiff expressed an unwillingness to see his neurosurgeon. Instead, he requested a second opinion. (Tr. 276-78)

Plaintiff presented to Dr. Daniel L. Kitchens with Cardinal Neurosurgery & Spine, Inc. On August 4, 2009. Plaintiff reported neck pain and some pain into his left shoulder and shoulder blade. Prior surgery helped his neck pain and numbness in left hand; however, the pain returned, causing headaches and pain in the back of his neck. Plaintiff described stiffness-type discomfort in the early morning, as well as pain into his left knee. Plaintiff had not tried physical therapy since the surgery. Review of systems was remarkable for chills, depression, forgetfulness, headache, loss of sleep, numbness, and sweats. Muscle, joint, and bone review was remarkable for neck, shoulder, back, leg, and knee pain. Motor examination demonstrated 5/5 strength in deltoids, biceps, triceps, grips, illopsoas, hamstrings, dorsiflexors, plantarflexors, and extensor hallucis longus. Plaintiff's gait was steady. He had decreased range of motion of the cervical spine, with good range of motion of the lumbar spine. Dr. Kitchens assessed persistent neck pain and some interscapular pain on the left side, with no signs of cervical radiculopathy or myelopathy. Dr. Kitchens recommended conservative treatments and gave Plaintiff a prescription for physical therapy. He also noted that a recent MRI showed no new disc herniation or spinal cord compression. (Tr. 281-83)

On December 7, 2009, Debbie Young-Tolliver, P.T., evaluated Plaintiff at the Physical Therapy Clinic. In a Functional Capacity Evaluation, Ms. Young-Tolliver observed that Plaintiff walked with a slight limp on the left and was very guarded and slow with gait and walking. He could walk on his toes and heels, with poor balance. Range of motion was limited in both shoulders and the cervical area. Plaintiff took medication for high blood pressure and high cholesterol, as well as ibuprofen for pain when needed. Plaintiff reported pain and burning between his shoulder blades, especially when using his arms. He also complained of left arm numbness in the morning, headaches, trouble sleeping, and pain in his left arm with use. After performing a variety of tests to evaluate

Plaintiff's endurance and stamina for work activities and lifting abilities, Ms. Young-Tolliver concluded that Plaintiff could work at the sedentary work level, but the test also suggested that Plaintiff could safely lift a the light work level. Specifically, testing showed that he could lift up to 20 pounds occasionally. He could possibly carry 30 pounds, but not on a regular basis. In addition, the testing indicated that he should not crouch, squat, perform trunk flexion standing, or stand for more than 20 minutes at a time. Ms. Young-Tolliver noted that Plaintiff was a high risk of further injury due to heavy lifting performed in the past and the fact that he still believed he could lift. (Tr. 286-93; Supp. Tr. 295) On December 8, 2009, Mike Gaddy, PAC, agreed with the functional limitations contained in Ms. Young-Tolliver's Functional Capacity Assessment. (Tr. 294)

## IV. The ALJ's Determination

In a decision dated January 8, 2010, the ALJ found that Plaintiff last met the insured status requirements for the Social Security Act on March 31, 2008. He did not engage in substantial gainful activity from his alleged onset date of September 17, 2007 through March 31, 2008. Plaintiff's severe impairments through the date last insured were status post left knee arthroscopy; status post C6 corpectomy with C5-C7 anterior cervical diskectomy and fusion; and obesity. However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 8-11)

After carefully considering the entire record, the ALJ found that, through the date last insured, Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work. The ALJ fully assessed the medical evidence, as well as Plaintiff's testimony and the testimonies of Plaintiff's wife, Karen Holloway, and his friend, Calvin Schleuning. The ALJ concluded that the RFC assessment was supported by the medical evidence which showed substantial, if not full, recovery

13

from knee and neck surgery; well-supported opinions from the treating team at St. John's Spine Center, Ms. Young-Tolliver, and the State agency medical center; and the Plaintiff's acknowledged daily activities which appeared unimpaired. (Tr. 11-13)

The ALJ further found that Plaintiff was unable to perform any of his past relevant work. In light of Plaintiff's younger age, marginal education, work experience, and RFC, a significant number of jobs existed that Plaintiff could have performed. The ALJ noted the testimony of the VE indicating several specific jobs in significant numbers both nationally and in Missouri. Thus, the ALJ determined that Plaintiff was not under a disability, as defined by the Social Security Act, at any time from September 17, 2007 through March 31, 2008. (Tr. 13-14)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902

F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## Discussion

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC by not including all of his nonexertional limitations. Further, the Plaintiff contends that the ALJ erred in finding the Plaintiff not credible. Thus, the Plaintiff asserts that substantial evidence did not support the ALJ's decision. Defendant, on the other hand, contends that the ALJ properly evaluated Plaintiff's credibility and RFC. Defendant further asserts that substantial evidence supported the ALJ's determination at step 5 of the sequential evaluation process.

## A. The ALJ's Credibility Determination

The undersigned finds that substantial evidence supports the ALJ's credibility determination in this case. "If the ALJ gives a good reason for discrediting the claimant's credibility, the court 'will defer to [his] judgment even if every factor is not discussed in depth.'" Frederickson v. Barnhart, 359

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

F.3d 972, 976 (8th Cir. 2004) (quoting Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001)).

For instance, the ALJ found that Plaintiff's own testimony concerning his daily activities demonstrated that he was able to perform a multitude of household chores, yard work, and other activities, including lifting up to 50 pounds. (Tr. 12-13) Letters provided by the third-party witnesses on Plaintiff's behalf corroborated Plaintiff's testimony by noting that, although he could no longer perform strenuous tasks, he could perform many physical activities nonetheless. (Tr. 12, 162-64) The ALJ properly found that this evidence showed that Plaintiff was able to perform at least sedentary work, despite Plaintiff's allegations of pain and numbness. (Tr. 11-12) "Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 1996). Further, "cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) (citation omitted).

In addition, the ALJ noted the lack of objective medical evidence supporting Plaintiff's claim of disability. While an ALJ may not discredit a plaintiff's subjective allegations of pain solely because the allegations are not supported by objective medical evidence, an ALJ can make a factual determination that the subjective complaints are not credible in light of contrary objective medical evidence. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (citations omitted)). In the present case, Plaintiff appeared to recover substantially from his neck and knee surgeries. After Plaintiff's knee surgeries in 2005 and 2009, Plaintiff's doctor recommended that Plaintiff return to normal activities shortly after the surgeries. (Tr. 249, 254) In addition, as noted by the ALJ, a cervical spine MRI in 2008 was negative, and his neurologist Dr. Lee released him to return to work

with no restrictions. (Tr. 12, 177, 180) Further, Dr. Kitchens, another neurologist, found normal motor strength, sensation, and gait, with no signs of cervical radiculopathy or myelopathy. Dr. Kitchens recommended conservative treatment. (Tr. 12, 281-83) Plaintiff used only ibuprofen for pain. (Tr. 288) "Allegations of disabling pain may also be discredited by evidence that the claimant has received minimum medical treatment and/or has taken only occasional pain medications . . . ." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). Further, while Dr. Kitchens gave Plaintiff a prescription physical therapy, Plaintiff did not participate in any ongoing therapy program. Instead the record shows only one evaluation by Ms. Young-Tolliver, solely for the purpose of determining Plaintiff's ability to work. (Tr. 286) "A failure to follow a recommended course of treatment also weighs against a claimant's credibility." Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (citation omitted).

Plaintiff argues, however, that his strong work record prior to his surgeries should afford him substantial credibility as a witness. However, as pointed out by Defendant, the ALJ did review Plaintiff's past relevant work, which demonstrated that from 2005 to 2007, Plaintiff only worked 2 days a week, and his other positions as a mill hand rendered little in earnings, with no earnings reported n 2006. (Tr. 13, 105, 114, 133-39) A work history characterized by low earnings casts doubt on a plaintiff's credibility. Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996).

In short, the ALJ properly assessed Plaintiff's subjective complaints of disabling pain and disbelieved his subjective reports based on inconsistencies in the record. See Eichelberger v. Barnhart, 390 F.3d 584, 589-90 (8th Cir. 2004) (holding that an ALJ may disbelieve subjective complaints of pain because of inherent inconsistencies and that the ALJ has the statutory duty in the first instance to assess a claimant's credibility). Contrary to Plaintiff's argument, the ALJ did not

solely rely on the lack of objective medical evidence but found that inconsistencies in the record as a whole did not support Plaintiff's subjective complaints of debilitating pain that prevented him from performing sedentary work. Id. Therefore, the undersigned finds that ALJ properly assessed Plaintiff's credibility.

## B. The ALJ's RFC determination

The Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence because it did not include all of Plaintiff's nonexertional impairments. Defendant, on the other hand, contends that the ALJ properly evaluated the medical opinion evidence and formulated Plaintiff's RFC.

The undersigned finds that the ALJ correctly assessed Plaintiff's RFC in this case. With regard to residual functional capacity, "a disability claimant has the burden to establish her RFC." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). Some medical evidence must support the RFC determination. Eichelberger, 390 F.3d at 591 (citation omitted).

The undersigned finds that substantial evidence supports the ALJ's RFC determination in this case. The record shows that Plaintiff was released to normal activity after both his knee and neck surgeries. (Tr. 12, 180, 254) Indeed, no medical doctor restricted Plaintiff's physical activities, which the ALJ properly took into account. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding substantial evidence supported the ALJ's decision where all but one doctor placed no

19

restrictions on the plaintiff's ability to work). Further, the ALJ did credit the opinion of Ms. Young-Tolliver to the extent that Plaintiff required limitations to her ability to crouch, squat, trunk flexion stand, or stand for no more than 20 minutes at a time. (Tr. 12) Of particular significance was the fact that Ms. Young-Tolliver stated that Plaintiff could perform work at the sedentary level but could lift at the light level. (Tr. 293)

Sedentary work requires "the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools." It also requires sitting, along with a certain amount of walking and standing. Social Security Ruling ("SSR") 96-9P. Because sedentary work requires occasional stooping, "[c]onsultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping." Id. Contrary to Plaintiff's assertion, the SSR requires consultation with a VE, not an automatic finding of disability, to determine the effect that only occasional stooping or an inability to stoop would have on the jobs identified by the VE. Shackleford v. Astrue, No. 4:10CV2175 AGF, 2012 WL 918864, at *14 (E.D. Mo. March 19, 2012).

The record demonstrates that the ALJ complied with SSR 96-9P and consulted a VE. Further, the ALJ's hypothetical included a limitation to no stooping. (Tr. 33) In response to the hypothetical and in light of Ms. Young-Tolliver's evaluation, the VE found that Plaintiff could perform work at the sedentary level that existed in significant numbers in both the national and Missouri economies. (Tr. 35)

In addition, while Plaintiff added the restriction of loss of dexterity in both hands, the Defendant correctly points out that the objective medical evidence did not support this limitation. First, Plaintiff did not report loss of dexterity as a symptom during the Functional Capacity

Evaluation. (Supp. Tr. 295) Further, the most recent neurological assessment demonstrated 5/5 grip strength and no evidence of radiculopathy or myelopathy. (Tr. 282-83) Physical examinations during the relevant period also demonstrated normal strength in arms and hands. (Tr. 180, 186) An ALJ is not required to include limitations in the hypothetical that are not supported in the record. Perkins v. Astrue, 648 F.3d 892, 902 (8th Cir. 2011). Other than Plaintiff's subjective complaints of dexterity loss, nothing in the medical record supports such a limitation, and the ALJ was not required to include bilateral manual dexterity limitations in the hypothetical. See Id. (finding hypothetical proper where the ALJ did not include Plaintiff's unsupported complaints of a need to nap during the work day). Thus, the ALJ properly excluded loss of dexterity from the RFC determination and the hypothetical posed to the VE such that substantial evidence supports the RFC finding.

In sum, the undersigned finds that the ALJ properly assessed Plaintiff's credibility and correctly determined Plaintiff's RFC and found that Plaintiff was able to perform work at the sedentary level, with certain restrictions as the VE testified. The determination was based on all of the evidence, including medical evidence contained in the record. Therefore, because substantial evidence supports the ALJ''s decision, the Court will affirm the final decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of March, 2012.